SWEENEY (UNITED STATES v.). See Case No. 16,426.

SWEENY (BANK OF COLUMBIA v.). See Cases Nos. 881 and 882.

SWEENY (CHERRY v.). See Case No. 2,-641.

═══════

## Case No. 13,687.

### The SWEEPSTAKES.

[1 Brown, Adm. 509.][1]

District Court, E. D. Michigan.   Sept., 1874.

COLLISION—TUG AND TOW—DIVISION AND ORDER OF TOW—FASTENING OF LINE.

1. A request by the masters of a tow to divide the vessels composing it, and take them separately through a narrow channel, would not create an obligation on the part of the tug to do so. It is the duty of the master of the tug to make up the tow, and he is entitled to exercise his judgment in that regard.
[Cited in Orhanovich v. The America, 4 Fed. 340.]

2. In arranging the order of vessels in tow, regard should be had to dangers incident to any portion of the route covered by the undertaking, and in passing through the channel of St. Clair flats the vessel of heaviest draft should be placed last.
[Cited in Orhanovich v. The America, 4 Fed. 340.]

3. The rule of the supervising inspectors requiring ascending vessels to stop before entering narrow channels, and wait till a descending vessel has passed through, does not apply to the lakes and their connecting waters.

4. In the absence of usage or positive law, it is not a fault for a tow to enter the channel of St. Clair flats while another tow is coming through in an opposite direction.

5. It is the duty of the tug to see that the towline is securely fastened, so as to hold in all emergencies likely to happen, ordinary or extraordinary, and the fact it does not so hold is the best evidence the duty is not performed.

6. Tugs are prima facie responsible in all cases for damages resulting from the slipping of the line.
[Cited in Bust v. Cornell Steam-Boat Co., 24 Fed. 190.]

On libel for towage and cross-libel for collision.

H. Norton Strong, owner of the tug Sweepstakes, since deceased, libeled the schooners Dobbin and Atmosphere, in separate suits, for towage services in the sum of $109 in the case of the Dobbin, and $81 in the case of the Atmosphere. The services were for towing the schooners as alleged in the same tow and in company with a third vessel, the schooner Couch, on the 14th and 15th days of October, 1872, from Lake Erie to Lake Huron. Thereupon Frank Perew, owner of the Dobbin, and Valentine Fries and Malcolm Stalker, owners of the Atmosphere, respectively put in their answers and filed cross-libels against the tug. By their answers and cross-libels they admitted the undertaking on the part of the tug, and the prices agreed on, as alleged, but charged

─────

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

fault and negligence on the part of the tug, and the consequent grounding of the head vessel in the tow in the channel on St. Clair flats, by which the vessels were caused to collide with each other, resulting in damages to the Dobbin in the sum of $8,000, and to the Atmosphere in the sum of $2,100, as claimed.

The cross-libels charged the tug with the following specified faults: (1) That she did not divide the tow and take the two schooners though the channel separately from the Couch, as her master was requested to do by the masters of those schooners. (2) That she did not arrange the tow so as to have the lightest draft vessel first. (3) That she did not stop and wait at the lower end of the channel for a descending tow to pass through. (4) That she did not properly and securely fasten her end of the tow line, but negligently permitted it to slip off.

Libellant Strong having died pending the litigation, his executor, Thomas Pitts, was admitted to prosecute the suits. Both suits and the cross-libels were heard together, and upon the same proofs.

F. H. Canfield and G. V. N. Lothrop, for the tug.

W. A. Moore and H. B. Brown, for the schooners.

LONGYEAR, District Judge. 1. As to the first charge of fault, in not dividing the tow, I am aware of no positive rule upon this subject, and no general duty in this regard, growing out of usage or otherwise, was shown, nor is it believed to exist. Whether it was a duty or not, therefore, depended, as it must depend in all cases, upon the special circumstances of the case in hand. A request on the part of the vessels comprising the tow would not of itself create a duty. The tug master was as much entitled to his opinion, as to the necessity, as were the vessel masters to theirs—in fact more so, because it was his right to say how the tow should be made up and taken through. Whether his decision was right or wrong, and if wrong, a culpable fault, depended upon the appearances when it was made, and not by what happened afterwards, unless what so happened might and ought to have been anticipated, and was in fact the result of taking the three vessels through together. But it is nowhere appears that the grounding of the Couch was caused by there being three vessels in the tow instead of only two. Non constat, the same thing might have occurred if the Dobbin and Atmosphere has been taken through without the Couch, as requested. The first allegation of fault is therefore not sustained.

2. As to the arrangement of the vessels in tow with reference to their difference in draft. The case of The Zouave [Case No. 18,221], decided in this court by my learned predecessor, the late Judge Wilkins, was, in its facts and incidents, almost identical

with the present case in regard to the point now under consideration. In that case it was held that it was not good seamanship, and was a fault for the tug master to so arrange his tow, in towing over the St. Clair flats, as to have the vessel of heaviest draft first in the tow. The only difference between that case and this is, that then the tow was going down, and here it was going up. No distinction, however, is noted on that account, neither do I presume that any exists in principle. It is true, in coming down, the current would add so much to the velocity and momentum of the vessels, and make it more difficult for those in the rear to steer clear of those forward of them, and to strike harder and do more damage in case of a grounding and collision. But the difference is not radical—it is only in degree. The current is very weak there, not exceeding two or two and a half miles per hour, and not sufficient to overcome the momentum of vessels moving against it in a tow at an ordinary and allowable rate of speed, so as to prevent a collision by the rear vessels in case of the grounding of any of the forward ones, especially so when, as in the present case, there was a brisk wind directly up the channel, or very nearly so. At all events, the current did not stop the rear vessels in the present case in time to prevent a collision and serious damage. In the present case the vessel of greatest draft, the Dobbin, was placed second in the tow; the next heaviest, the Couch, first, and the lightest, the Atmosphere, last. But the Couch alone grounded, and the arrangement of the vessels in the tow being proper as between her and the Dobbin, nothing can be claimed under this charge of fault on account of damage done the Dobbin by her running into the Couch. But the arrangement was not a perfect one as between the Couch and the Atmosphere, the former being of the greater draft, and being placed forward of the latter in the tow. Therefore, as far as the Atmosphere was concerned, the tug committed a fault in this respect, which, on the authority of The Zouave, supra, — to the reasoning and conclusion of which I agree,—would make the tug liable, so far as concerns the damage done to both the Dobbin and the Atmosphere, by the latter running into the former, unless the Atmosphere could have avoided the Dobbin, of which, however, I believe there is no pretense. Tugs have the right to direct how their tow shall be made up. In all cases, in arranging the order of the vessels in the tow, the tow should be made up with reference to dangers incident to any portion of the route covered by the undertaking. Here the St. Clair flats were so covered, and the tow should have been made up with the same care in this regard as if the undertaking covered that portion of the route only; or, at least, if not so made up originally, it should have been changed to meet the case

when the flats were reached. The channel on St. Clair flats is quite narrow and somewhat crooked—vessels do sometimes ground there. There is, to say the least, a liability to ground or risk of grounding there; and that is sufficient to impose the duty now under consideration. That vessels usually or frequently ground there was not necessary to be shown. The second allegation of fault is therefore sustained.

3. In not waiting for the downward tow to pass through before entering the channel. The rule of the supervising inspectors, requiring that when two vessels are about to enter a narrow channel at the same time, the ascending vessel shall be stopped below such channel until the descending vessel shall have passed through, etc., has no application ex proprio vigore to the lakes and their connecting waters, and therefore not to the present case, as was contended. It applies only to the rivers flowing into the Gulf of Mexico and their tributaries (see Rules of June 12, 1871, "For Western Rivers"; also, caption to "Pilot Rules for Lakes and Seaboard," of June 10, 1871). No such rule, I believe, exists by virtue of any positive law or regulation, or by the decisions of courts, in regard to the lakes and their connecting waters; no good reason is apparent, however, why, on principle, it should not apply as well to narrow channels, of which there are many connecting the lakes, and through which the path of a vast navigation lies, as to Western rivers. However, in the absence of positive law and of any common usage to support it, I do not conceive that the court can lay down any general rule upon the subject. Each case must be governed by its own peculiar circumstances. Certainly no court would hold a tug blameless that should recklessly, whether ascending or descending, lead a tow into a narrow channel, like that on the St. Clair flats, when crowded with vessels moving in an opposite direction. But I think the court would hardly be justified in applying such a rule to even an ascending tug, when, as in this case, another tug was about entering or even had entered the channel from the opposite direction with a single vessel in tow. It would be contrary to common usage to require a tug to wait under such circumstances; neither is it hazardous to any considerable extent for tugs with even more than one vessel in tow, if properly arranged and properly managed by all concerned, to attempt to pass each other in that channel, nor is it so deemed by competent navigators. The third charge of fault is, therefore, not sustained.

4. In not properly fastening the tow line. If the charges of fault were to be determined solely by the expert testimony as to the mode of fastening adopted, it would have to be decided that the line was properly fastened, as far as the mode of fastening is concerned. But the question raised goes be-

yond the mere mode of fastening. Conceding the mode to have been correct, the real question is, was it properly and securely fastened according to that mode? Undoubtedly it was the duty of the tug to see that the line was securely fastened, no matter what mode of fastening was adopted, and so as to hold in all emergencies likely to happen, whether ordinary or extraordinary; and the fact that it did not so hold is the best evidence that the duty was not performed. I know of no safe rule other than to hold tugs responsible prima facie in all cases, for injuries resulting from the tow line slipping or giving way from its fastening upon the tug. The expert testimony shows, and without it common sense teaches, that a tow line can be fastened so that it will not slip, and therefore the above rule is not unreasonable. The Quickstep, 9 Wall. [76 U. S.] 665; The Olive Baker [Case No. 10,489]. This view of the matter narrows the controversy upon this point down to the question whether the Couch grounded before the line slipped, or whether the line slipped first and the grounding was on that account; because, if the former, then the slipping of the line cannot be attributed as the cause of the disaster, although it may be evidence of a faulty fastening; but if the latter, then it may have been the direct cause, and the fact of slipping alone sufficient, unexplained, to hold the tug responsible for all the unavoidable consequences of the grounding. As to this very material point, the testimony was conflicting. That of the officers and men upon the tug, on the one side, and of those upon the Couch and the other vessels composing the tow, upon the other, were in direct and irreconcilable contradiction of each other. These extremes stand upon an equality as to interest, those upon each side being anxious and desirous, of course, to fasten the blame upon the other, and if there were no other testimony it would be exceedingly difficult to come to anything like a satisfactory conclusion. But there was other testimony, and that must turn the scale. The officers and men upon the Lion and the Perew, the passing tug and tow, fully corroborated those upon the Couch, and the other vessels composing the tow. Their witnesses had an opportunity of observing, equal at least to those upon the tug, and greater than those upon the Dobbin and the Atmosphere, and they had no interest to see things as they were not. Their testimony is therefore entitled to the greater weight. It must be borne in mind, also, that the officers and men upon the Couch were in a better situation than any of the others to know what occurred first, and therefore their testimony, aside from the question of interest, which as between them and those upon the tug is equal, is of greater weight. There is, therefore, a preponderance of evidence that the line slipped before the Couch grounded, although I must confess it is not free from doubt. The only remaining question is whether the grounding of the Couch was in consequence of the slipping of the line. I think it quite evident from the position of the tow in the channel while passing the downward tow, and considering the great breadth and flatness of bottom of the Couch, that she was "smelling" the bank and tending toward it, notwithstanding the starboard helm, when the line slipped, and in the absence of evidence to the contrary, I think it fair to assume that if the line had not slipped the tug would have overcome that tendency and prevented the grounding. The grounding of the Couch must, therefore, be held to have occurred in consequence of the slipping of the line, and the fourth charge of fault is sustained. The tug is, therefore, held in fault in two particulars: (1) In not so arranging the tow as to place the lightest draft vessel, the Atmosphere, first instead of last. (2) In permitting the line to slip. It is nowhere made to appear, neither is it claimed, that the Dobbin would have avoided the Couch, or the Atmosphere the Dobbin after the Couch had grounded. The tug must, therefore, be held liable for the damages caused by the collision.

5. As to the tug's claim for towage services. The contract was to tow to Lake Huron. She towed the Dobbin to Port Huron, near the entrance to the lake. Here the Dobbin was obliged to stop and lay up for repairs. Ordinarily a contract to tow to Lake Huron would require that the tow should be taken into the waters of the lake; but, under the circumstances of this case it must be held that the contract was substantially performed. The wind being favorable, the Atmosphere sailed up from the flats or a little above, but the tug was ready and willing to tow her up, if the Atmosphere had seen fit to avail herself of the tug's services. The Atmosphere can therefore claim no exemption from paying the full amount of the contract price. The tug must, therefore, be allowed the contract price for towing in each case, viz. $109 against the Dobbin, and $81 against the Atmosphere, to be offset against the damages sustained by each. Decrees accordingly.